18934

The STATE, Respondent, v. Samuel L. GILCHRIST, III, Appellant
(168 S. E. (2d) 779)

*Messrs. Falcon B. Hawkins* and *James A. Stuckey, Jr.*, of Charleston, *for Appellant,*

24

*Messrs. Robert B. Wallace* and *A. Arthur Rosenblum*, *Assistant Solicitors*, of Charleston, *for Respondent*,

*Messrs. Falcon B. Hawkins* and *James A. Stuckey, Jr.*, of Charleston, *for Appellant*,

July 1, 1969.

BRAILSFORD, Justice.

The defendant, Samuel L. Gilchrist, III, on April 4, 1964, in the City of Charleston, killed one Christopher Polite by shooting him repeatedly with a .38 caliber revolver. He was tried at the May, 1966, term of the Court of General Sessions, was convicted of manslaughter and was sentenced to serve a term of fifteen years. Gilchrist was represented at his trial by J. Louis Lempesis, an experienced and capable member of the Charleston Bar, who had been retained promptly after the homicide. Mr. Lempesis noted a motion for a new trial on which argument was deferred. One week later, and before the motion was disposed of, Mr. Lempesis was indefinitely suspended from the practice of law by order of this court. This order was the culmination of disciplinary proceedings based upon charges of professional misconduct occurring prior to May, 1962, some four years before the trial. No publicity had been given to these charges or proceedings prior to the filing of the order of suspension, and Mr. Lempesis was a qualified attorney on the trial date.

Messrs. Falcon B. Hawkins and James A. Stuckey, Jr., of the Charleston Bar, were substituted for Mr. Lempesis as counsel of record for Gilchrist. They moved for a new trial upon the ground that he had been denied due process of law and the right to have the assistance of counsel for his defense. Quoting from the motion: "This denial and violation were caused by the lack of diligence and competence in trial counsel's representation of the accused; and, as a result of this lack of diligence and competence, the Defendant was denied a trial as we understand that term." This motion was heard by Judge Singletary, who had presided at the trial, and this appeal is from its refusal by him.

On the afternoon of the homicide, Gilchrist, alone, and Polite, with two companions, Edward Francis and Woodrow Campbell, ate at the Ocean View Cafe on Market Street, also known as the Honey Boy. After finishing their meal,

Polite's companions went outside. Polite walked over to the counter where Gilchrist was seated. Polite was on military leave, and this was the first encounter between the two men since Gilchrist's marriage to Polite's sister had terminated in divorce. Polite's attitude was hostile, and he followed Gilchrist outside.

In a written statement which he gave to the police shortly after the homicide, Gilchrist described what then took place. "I walked outside toward my car and Christopher came out the same time and he called me, Gilchrist, its something I have been wanting to do for a long time. I asked him what. He didn't answer. Instead he boxed me in the mouth and kept hitting me several times. I asked him to stop. He was about to get me down. I didn't know his intentions so I pulled my pistol out of my pocket and fired at him until it was empty and remained until the police came and I gave the pistol to the detective and told them what I have done and they brought me to Police Headquarters."

At the trial the State called five witnesses who were at or near the scene of the difficulty.

Edward Francis, one of Polite's companions, was seated in a car in front of the cafe. He saw Gilchrist and Polite come out of the cafe and in a minute or two noticed that "they were hooked up together * * * tussling with each other." They broke loose from each other. "I mean Gilchrist pushed Chris (Polite) back and about that time he reached and got the weapon and started firing." "Q. And during this time what was Christopher Polite doing? A. Well, Gilchrist was backing up and Chris was still advancing toward him and evidentally the shots got to him because he just fell, fell on the sidewalk."

Rutledge White, the operator of the cafe, saw the two men leave together but observed nothing unusual until he heard four or five shots. He did not actually see the fight or the shooting but looked through the window and saw Polite fall.

John Wurtz, operator of Richards, a bar next door to the Honey Bar, heard a shot and ran to his window. When he

looked out, "the man was standing with his back against my window and the other man was in front of him and the man that was back against my window had a pistol and was shooting the other man." Only the window pane separated the witness from the man with the gun, who was "just standing there shooting." The other man was immediately in front of him, unarmed, with his hands in the air; 'after he took three or four bullets or whatever went in him, I know at least three went in him, he fell back over toward the Honey Boy, on the street."

Robert B. Comar, Jr., a patron of Richards, heard the shots but did not see anything until after Polite had fallen. He, and other witnesses, noticed that Gilchrist had a cut upper lip.

James Simmons, Jr., a patron of Richards, was standing near the front door. He saw two men "scuffling" by, and, as they disappeared from his view, he heard shots. He went immediately to the door and "saw one fellow falling toward the sidewalk and the other had a gun in his hand." The man who fell had nothing in his hands. "His hands were up as he was falling."

Gilchrist's own narration at the trial of what took place after he and Polite walked out of the Honey Boy varied markedly from his earlier statement.

"Q. So then what happened? * * *

"A. I walked outside and he came directly behind me. I headed toward the direction where my car was parked and Chris said, 'Hey, Samuel.' I turned around and he said 'there is something I have been wanting to do for a long time' and before anything else happened he knocked me down. I fell down to the sidewalk. There was a vehicle parked there, a light pickup truck and he kept beating me and kicking me and stomping me and I began to bleed and get dizzy and he was on top of me. I was halfway on the sidewalk and halfway on the pavement and he mumbled something, 'I'm going to kill you.' At that time I knew he was about to get me down. He reached * * *

"Q. By get you down, what do you mean?

"A. I mean take my life.

"Q. Go ahead.

"A. He reached in his pocket and pulled out a shiny object and I managed to get my hand, left hand, in my pocket and I pulled my revolver from the pocket and began to fire. * * *

"* * * I don't know how many times I fired. I was afraid and I was trying to get the man off me and he finally got up and fell backwards. * * *"

After the homicide, it was ascertained that the .38 caliber pistol contained five spent rounds. No weapon was found on or near Polite's body.

Gilchrist was the only witness called by the defense who was present at the scene of the homicide. His testimony that Polite was the aggressor was corrborated in part by the testimony of Edward Francis and was not disputed by any witness. On the other hand, his testimony that he fired the pistol into Polite's body while he was on his back, being beaten and stomped by Polite, when Polite, threatening to kill him, pulled a "shiny object" out of his pocket, was wholly uncorroborated. It was directly contradicted by the testimony of Edward Francis and John Wurtz, and was inconsistent with some of the other testimony. On the other hand, the statement which Gilchrist gave to the police on the day of the homicide was consistent with the testimony of the State's witnesses at the trial.

Although other matters are referred to incidentally, the only dereliction, charged to Mr. Lempesis in his representation of Gilchrist, of which we need take notice is this. It is claimed that he seriously prejudiced his client's cause by failing to interview and in not having available at the trial two eyewitnesses, whose names were furnished to him by the defendant's father, and whose testimony would have tended to support the defendant's plea of self-defense. The factual showing in support of this charge rests in three affi-

davits, one by defendant's father, one by Hayward Mazyck and one by Melvin Palmer.

The father's affidavit asserts that he and his son "told Mr. Lempesis of two witnesses who were present at the time the man was killed, and Mr. Lempesis assured them that he had discussed the case with these witnesses and would have the witneses at the trial; that Mr. Lempesis also told them that he had found other witnesses who would testify in his son's behalf, none of which materialized at the trial; * * *."

The affidavit of Hayward Mazyck states that on the occasion in question he was approaching the Ocean View Cafe, on Market Stret in the City of Charleston, when two men, one of whom he recognized as Sam Gilchrist, III, and the other of whom he later learned to be Polite, came out. "(T)he next thing he knew the Polite boy hit Gilchrist in the face or head; that he hit him again; that the Gilchrist boy fell down and the other boy jumped on him; that he was beating him down on the ground; that he heard some shots; the other boy got up staggering; that he turned around and went back home; that he told his wife that he had seen a fight and that he knew one of the boys involved; that he later learned that the boy Gilchrist was fighting with had died; that about two or three weeks later he saw Sam Gilchrist, Jr. and told him that he was sorry that his boy was in trouble, and that he had seen part of the fight; that he told him he would be glad to tell what he knew; that no one ever contacted him until a few days ago when Sam Gilchrist, Jr., asked him to go down to Mr. Hawkins' office and tell him what he saw."

The affidavit of Melvin Palmer states that as he approached the Ocean View Cafe, "he heard a conversation between Samuel Gilchrist, III, and a person he later learned to be Chris Polite; that he observed Polite hit Gilchrist, and a scuffle ensued; that he did not witness the actual shooting but heard the shots being fired; that he informed Samuel Gilchrist, Jr., the father of Samuel Gilchrist, III, of what he had seen, and told him that he would be willing to give a

statement; that no one ever approached him again concerning this matter until Samuel Gilchrist, Jr. asked him to come down to the offices of Hollings and Hawkins, Attorneys, and to give a statement."

The trial judge recognized that these affidavits, if true, would establish neglect by counsel of his duty to interview the witnesses and determine their value to the defense. However, he pointed out that neither Gilchrist nor his father expressed any dissatisfaction with counsel's services until after he was suspended from practice. Instead, they continued to employ him. From his personal observation of the trial, the judge was "convinced that Mr. Lempesis presented the defense in an able, competent and diligent fashion." He concluded that the charges against Mr. Lempesis had not been proved. Alternatively, he found that any negligence on counsel's part did not result in prejudice so as to "prevent (the defendant) from securing a fair and impartial trial."

We agree that the charges against Mr. Lempesis have not been proved. In the first place, the transcript of Mr. Lempesis' examination and cross-examination of witnesses clearly discloses that he was familiar with the case, had visited the scene, had interviewed witnesses, and had ascertained the persons present in both the cafe and the adjacent bar at the time of the homicide, some of whom were not called as witnesses by either side. If Hayward Mazyck or Melvin Palmer was in fact in the vicinity of the shooting, the affidavits in support of the motion fail to disclose that Mr. Lempesis either knew of their presence or was negligent in failing to discover it. These two reputed witnesses are not named in the affidavit of defendant's father, or otherwise identified, although the same affidavit does name potential character witnesses who were suggested to Mr. Lempesis.

But if we assume that these two witnesses were named to Mr. Lempesis, and that he was negligent in not interviewing them, we agree with the circuit judge that no prejudice resulted. The very most that either affidavit shows is that the victim was the aggressor and dominant party in a fist fight

and scuffle between two young men during which the shooting occurred. These affidavits have no reasonable tendency to justify killing of an unarmed man by emptying a .38 caliber revolver into his body. They merely tend to support the defendant's post homicide statement to the police and the jury's verdict that the killing was in sudden heat of passion upon a sufficient legal provocation.

Under our view of the facts, an extended discussion of the law is unnecessary. The comprehensive annotation, 74 A. L. R. (2d) 1390, discloses that only in extreme cases, few in number, has relief been given from a conviction because of the claimed incompetency or neglect of retained counsel. The annotator, at page 1397, *ibid,* deduces from the decisions that "the incompetency (or one of its many synonyms) of private counsel for the defendant in a criminal prosecution is neither a denial of due process under the Fourteenth Amendment, nor an infringement of the right to be represented by counsel under either the federal or state constitution, unless the attorney's representation is so lacking that the trial has become a farce and a mockery of justice, in which case the judgment, violating either the Fifth, Sixth, or Fourteenth Amendment to the Federal Constitution, or a provision of a state constitution, is void." This is not such a case.

Affirmed.

Moss, C. J., and LEWIS, BUSSEY and LITTLEJOHN, JJ., concur.